# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-1161

## NOT FOR PUBLICATION

**MAXWELL PERRY MOORE**

**VERSUS**

**AIMEE PAUL MOORE**

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 254-126-F
HONORABLE GEORGE METOYER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Billy H. Ezell, and John E. Conery, Judges.

**REVERSED, JUDGMENT VACATED. JUDGMENT RENDERED, MOTION TO RELOCATE GRANTED**.

**Angelo J. Piazza, III**
**P.O. Box 429**
**Marksville, LA 71351**
**(318) 253-6423**
**Attorney for Aimee Paul Moore, Defendant/Appellant**

**R. Greg Fowler**
**3918 B. Independence Drive**
**Alexandria, LA 71303**
**(318) 487-9200**
**Attorney for Maxwell Perry Moore,**
 **Plaintiff/Appellee,**

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

Aimee Paul Moore (Aimee) and Maxwell Perry Moore (Max) entered into a Consent Judgment dated December 14, 2015, which granted the parties joint custody of their minor children Lexi Kay Moore (age seven) and Rhett Lee Moore (age four) and named Aimee as the primary domiciliary parent. Max was to have visitation with the children every other weekend from Friday at 6:00 P.M. to Sunday at 6:00 P.M. and on Tuesday nights from 6:00 P.M. during his "off weeks." The judgment also included a holiday schedule for visitation. Under the consent judgment Max was ordered to pay child support in the amount of $1,386.51 per month for the period of November 10, 2015 through January 1, 2016. Beginning on January 2, 2016, Max's child support obligation would be reduced to $983.26 per month payable in equal installments on the first and fifteenth of each month. The judgment recited that as of December 14, 2015, Max was in arrears on his child support obligation and interim spousal support obligation in the amount of $2,733.26 and was thus ordered to pay an additional $100.00 per month until such amount was paid in full. The judgment also contained language prohibiting both parties from having members of the opposite sex to whom they were not related by blood or marriage from overnight stays with either of the children present.

On December 12, 2016, the trial court rendered a judgment of divorce and, by agreement of the parties, modified the previous consent judgment reducing Max's monthly child support obligation to $500.00 per month and terminating interim spousal support. The parties also agreed, as reflected in this consent judgment, that Max would have custody of the two children during June and July

during which time Aimee would have visitation with the children every other weekend and during this time period Max would not have to pay any child support. On July 26, 2017, Max filed a civil action entitled "Objection to the Relocation of the Minor Children, Order to Not Relocate the Minor Children, Order Granting Temporary Custody of Children Until a Hearing, Rule to Modify Domiciliary Parent Status, Order to Suspend Child Support Until a Hearing, Rule to Modify Child Support, and Motion and Order to Appoint Private Process Server." On that same date, July 26, 2017, the trial court signed an ex parte order that set a rule to show cause hearing for August 28, 2017. It also included therein an ex parte order for temporary custody of the minor children with Max and it suspended Max's child support payments. The ex parte order further included a temporary restraining order forbidding Aimee from relocating the children until "a hearing and decision is made" by the court.

Aimee filed an Answer and Reconventional Demand which included a Motion for Relocation. The trial court issued an Order on August 14, 2017, consolidating all matters in docket number 254,126, Ninth Judicial District Court. Max filed a motion for continuance which the trial court granted setting the hearing "to determine if Aimee shall be allowed to relocate the minor children" on September 13, 2017.

After a full hearing on the matter the trial court signed a judgment on September 25, 2017, dismissing Max's Rule for Modification of Domiciliary Status and Custody and recalling and vacating the Temporary Custody Order dated July 26, 2017, "declar[ing that] order null and void pending the mother's return to Rapides Parish." The trial court reinstated the judgment rendered on December 12, 2016, "in all respects upon the mother's return to residency in Rapides parish

2

[sic]." The judgment further decreed "that the Rule for Relocation filed by the mother, AIMEE PAUL MOORE in her attempted move to Walker, Louisiana, is hereby denied for reasons stated in open court . . ." The court also set a show cause hearing for October 30, 2017, for the parties to appear and demonstrate whether they have complied with "all orders herein in the reinstatement of the judgment of December 12, 2016 . . ."

At the close of the hearing the trial court stated on the record:

This matter was not considered a custody litigation as much as it was a relocation litigation. Because it was not a custody, the parties have never fought over custody, they've only fought over times, money, but never custody. And with that the Court will rule that Ms. Aimee Paul will be the custodial parent. She will continue to have custody of the child (sic) based upon the current custody arrangement. And Mr. Perry will also have joint custody with the other parent, and he will have visitation according to the previous custody arrangement. The order that gives him custody of the two minor children will be suspended as soon as Ms. Paul moves back to the Deville area, Rapides Parish. And once that matter is done, then custody will revert back to the previous judgment. . . .

. . . . Mr. Moore, you—you will retain custody of the children until Ms. Moore moves back to Rapides Parish. And if she decides not to move back to Rapides Parish, the Court will note that and make adjustments accordingly. The custody matter will be continued until, let's see, August—I mean, October 30th, at which time I'll see whether or not the parties (sic) have moved back or made a decision not to move back, at which time I'll adjust the custody accordingly.

The trial court did not articulate any of its reasons for denying the motion for relocation and when urged by Max's attorney to "articulate its reasons under the factors of [La.R.S.]9:355.1 as to why [the trial court] made [its] ruling and how [the trial court] made [its] ruling" the trial judge expressly refused to do so. Max's attorney cautioned the trial court that its failure to articulate its reasons under the statute would "allow" this court to conduct a de novo review. The trial court stated

3

on the record "They can have it. I—I've already articulated. . . They can have at it if they want to re-try it."

Aimee appeals the trial court's denial of her Motion to Relocate asserting the trial court erred as a matter of law in failing to consider the twelve factors set forth in La.R.S. 9:355.14 and in failing to assign any reason for its denial of relocation. Max did not appeal any aspect of the trial court's judgment.

LAW AND ANALYSIS

Louisiana Revised Statutes 9:355.10 sets forth the burden of proof in a relocation case: "The person proposing relocation has the burden of proof that the proposed relocation is made in good faith and is in the best interest of the child." The factors to be employed by the trial court, and by this court on de novo review, are set forth in La.R.S. 9:355.14:

> A. In reaching its decision regarding a proposed relocation, the court shall consider all relevant factors in determining whether relocation is in the best interest of the child, including the following:
>
> (1) The nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child's life.
>
> (2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development.
>
> (3) The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.
>
> (4) The child's views about the proposed relocation, taking into consideration the age and maturity of the child.
>
> (5) Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.

4

(6)    How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity.

(7)    The reasons of each person for seeking or opposing the relocation.

(8)    The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.

(9)    The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations.

(10)    The feasibility of a relocation by the objecting person.

(11)    Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.

(12)    Any other factors affecting the best interest of the child.

B. The court may not consider whether the person seeking relocation of the child may relocate without the child if relocation is denied or whether the person opposing relocation may also relocate if relocation is allowed.

We have previously held that a trial court must consider these factors and failure to do so is legal error. Here, we are not left to speculate as to whether the trial court considered these twelve factors in making its determination about relocation. The trial court expressly refused to consider these factors and thus we must conduct a de novo review if the record is sufficiently complete. We find this record is sufficiently complete as it contains a full transcript of all testimony heard at the hearing on the motion to relocate and contains all exhibits entered in evidence as well as all pleadings filed in the matter and all judgments pertaining to the matter. In *Leger v. Leger*, 03-419 pp. 1-2 (La.App. 3 Cir. 7/2/03), 854 So.2d 955, 956–57 (footnote omitted), we held:

5

In *Johnson v. Johnson*,[99-1933 (La.App. 3 Cir. 4/19/00), 759 So.2d 257, *writ denied*, 00-1425 (La. 5/31/00), 762 So.2d 635], we found that the trial court erred in failing to analyze the factors set out in the relocation statute, La.R.S. 9:355.12, even though it listed them in its reasons for judgment. The same is true in the case at bar. While the trial court listed the factors to be considered, it did not consider the factors individually concerning the particular evidence presented. It simply noted "what a heavy burden the question of relocation has on all of the parties involved," followed by a discussion of the general problems that relocation of any parent could create. It then pointed out that the children were excelling in school and stated, "This court is unwilling to put the children in **ANY RISK** associated with a move to Lake Jackson, Texas." This language implies that, under this standard, no relocation would be acceptable and that the trial court imposed a higher burden on Melissa than the law requires.

When a trial court incorrectly applies a principle of law, which causes a substantial deprivation of a party's rights or materially affects the disposition, it commits a legal error. [*Evans v. Lungrin*, 97-541 (La. 2/6/96), 708 So.2d 731.] Applying the wrong burden of proof is not only an incorrect application of the law, it is inherently prejudicial because it casts a more onerous standard than the law requires on one of the parties. When a trial court commits a prejudicial legal error which affects its analysis of the facts, we are not bound by the manifest-error standard; rather, we must conduct an *de novo* review if the record before us is complete. [*Id.*] Because we have a complete record in the instant case, we continue with an independent review, applying the correct standard.

*See also*, *Cass v. Cass*, 10-327 (La.App. 3 Cir. 11/17/10), 52 So.3d 215, *writ denied*, 11-178 (La. 2/25/10). 58 So.3d 460.

We are further instructed by the state supreme court in *Gray v. Gray*, 11-548 p. 12-13 (La. 7/1/11), 65 So.3d 1247, 1255:

"In determining the child's best interest, the court shall consider the benefits which the child will derive either directly or indirectly from an enhancement in the relocating parent's general quality of life." La.Rev.Stat. 9:355.13. Although La.Rev.Stat. 9:355.12 sets forth the factors the court must consider in determining whether the proposed relocation is in the best interest of the child, *see* Note 2, *supra,* there is no requirement that a court give preferential consideration to any factor. *See Curole* [*v. Curde*, 02-1891] p. 6, 828 So.2d 1094 [La. 10/15/02] at 1097.

First, we find our review of the record demonstrates Aimee met her burden to prove that the proposed relocation is made in good faith. Aimee and Max's current wife, Dusty Jo, exchanged text messages that were introduced as evidence. It is clear that Aimee had no intention of relocating the children without telling Max or without involving him in that decision. When Aimee first discussed the matter with Max she anticipated her move would be in the area of New Roads, Louisiana or Zachary, Louisiana, but circumstances developed culminating in her decision to relocate to Walker, Louisiana with her husband-to-be, Aric Paul Pillard (Aric). Aric purchased a home in Walker where Aimee intends to reside as his wife. Aimee testified without contradictory testimony that she and Aric will be married in the near future and that she selected this home as the couple's new home. Max testified that he had no objection to Aimee moving to New Roads but after learning that Aimee's fiancé purchased a home in Walker he expressed his opposition to any relocation. According to information obtained from MSN.com the geographic distance from Deville, Louisiana to New Roads, Louisiana is seventy-five (75) miles, give or take, depending on the exact locations in each town, requiring an estimated driving time of one hour and fifty minutes. Thus, such a move would fall within the purview of the relocation statutes. According to the same source the distance between Deville, Louisiana and Walker, Louisiana is approximately 125 miles and requires an estimated driving time of two hours and twenty-five minutes. Though Max says he was not opposed to the children moving a distance almost a two-hour drive away he now contends he is opposed to the children moving an additional twenty-five to thirty-five minutes away, but he offers no explanation as to why. We note too, Max testified his father lives some forty-five minutes away from Deville, but he has never had a problem being able to

7

visit with his grandchildren. Additionally, the record reflects Aimee agreed to significantly lower Max's child support obligation based on her understanding that he did not oppose her relocation. Max disputes this assertion but presents no other convincing reason for Aimee's agreement to lower his support obligation. Moreover, when questioned on the witness stand about the reduction in support and the additional time in the summer Max testified as follows:

> Q. Listen, that's not the question. The question's very simple. You had a state of mind that the reason she went from $1,300.00 down to 500, because she was going to get your cooperation on her anticipated move. Yes or no?
>
> A. Yes. I told her I would . . .
>
> Q. All right.
>
> A. . . . discuss it with her.
>
> Q. So you did lead her to believe by accepting that significant reduction and the added time in the summer that you, in contemplation or at least expecting that she would be moving, you knew that information at that time?
>
> A. Yes, sir, to New Rhodes (sic).

Further testimony from Max demonstrated he knew about Aimee's intended move to Walker at least as early as January 11, 2017, thirty days after he and Aimee signed off on the consent judgment lowering his child support obligation and making him domiciliary parent for June and July. Text messages between Dusty Jo and Aimee on January 11, 2017, show Dusty Jo acknowledged Aimee's plans to "[move] to Walker." Additional text messages between Aimee and Dusty Jo a few days later confirmed the work Aimee and Aric were doing on the new house in Walker and there is no mention that Max does not agree with that move. Max asserts he sent a message to Aimee expressing his change of heart about the move but testified he "can't tell you that date" and has no record of it. He did,

however produce subsequent text messages on January 22-23, 2017, between he and Aimee in which, after a profanity-laced tirade by both parties, Max threatens court action and voices his opposition to any relocation. He did not follow through on his intention to seek the court's involvement until July 26, 2017.

It is also undisputed that Aimee offered to bear the cost of and provide transportation for the children to visit Max, if she is allowed to relocate to Walker. Aimee provided convincing evidence that the move to Walker is necessary to accommodate Aric's job and that Aimee's relationship with him will provide a better home for the children and will allow Aimee to spend a great deal of her time with the children, especially to meet the needs of Rhett. She also provided testimony and evidence demonstrating that the public school in Walker is a highly-rated school.

Max complains that Aimee did not give written notice of relocation as required by La.R.S. 9:355.5. Louisiana Revised Statutes 9:355.3 delineates the person "authorized to propose relocation of the principal residence of a child" who must comply with the notice requirements set forth in La.R.S. 9:355.5:

> The following persons are authorized to propose relocation of the principal residence of a child by complying with the notice requirements of this Subpart:
>
> (1)  A person designated in a current court decree as the sole custodian.
>
> (2)  A person designated in a current court decree as a domiciliary parent in a joint custody arrangement.
>
> (3)  A person sharing equal physical custody under a current court decree.
>
> (4)  A person sharing equal parental authority under Chapter 5 of Title VII of Book I of the Louisiana Civil Code.

(5)    A person who is the natural tutor of a child born outside of marriage.

Louisiana Revised Statutes 9:355.2(B)(3) requires written notice to the non-moving party when "There is a court order awarding custody and there is an intent to establish the principal residence of a child at any location within the state that is at a distance of more than seventy-five miles from the principal residence of the child at the time that the most recent custody decree was rendered." Aimee did not actually remove the children from Rapides Parish before a court proceeding was had. She asserted in her testimony that she believed the parties had agreed to such a move as evidenced by the additional summer visitation time she agreed to give Max and by the reduction in Max's child support obligation, both memorialized in the consent judgment. Additionally, even if Aimee were required to provide written notice, her failure to provide such notice does not mandate a denial of relocation. Louisiana Revised Statutes 9:355.6 provides:

> The court may consider a failure to provide notice of a proposed relocation of a child as:
>
> (1)    A factor in making its determination regarding the relocation of a child.
>
> (2)    A basis for ordering the return of the child if the relocation has taken place without notice or court authorization.
>
> (3)    Sufficient cause to order the person proposing relocation to pay reasonable expenses incurred by the person objecting to the relocation.

Considering the evidence, we find Aimee acted in good faith and relied on what she reasonably believed were mutual understandings and agreements between Max and her in advance of executing any plan to relocate the children.

We turn to focus on the twelve factors set forth in La.R.S. 9:355.14 to determine whether Aimee has met her burden to establish that relocation of the children's primary domicile to Walker, Louisiana is in their best interests.

> (1)  The nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child's life.

In the original consent decree, the parties agreed Aimee would be the primary domiciliary parent.  Aimee has been the primary caretaker of these children since birth.  Max did not present any evidence to demonstrate why Aimee should not continue to be the domiciliary parent.  We note the trial court agreed that Aimee should continue to be the domiciliary parent of the children if she agreed to remain in Rapides Parish.  Both parents have enjoyed a good relationship with these children and Aimee, as the parent seeking relocation, has consistently made an effort to involve Max and his family in the children's lives.  Text messages introduced at the hearing show Aimee and Dusty Jo communicate well regarding the children.  Max's involvement with them and testimony showed the children enjoy a good relationship with their stepmother's parents as though they were blood relations.  Aimee and Dusty Jo have a positive history from the time they were young girls and the text messages between them show maturity and civility and a genuine interest in what is best for these children.  Unfortunately, the same cannot be said for the text messages between Max and Aimee at times.  Max's mother and stepfather spend at least half of their time at their home in the Deville area and half of their time at their residence in Baton Rouge, located only thirty-five miles from Aric's new home in Walker.  Aimee has not interfered with their visiting the children in the past.  We note if the children remained in Rapides

Parish these grandparents would have to travel that direction from Baton Rouge at least half of the year if they desire to see their grandchildren. We find these facts favor relocation with the mother.

> (2)    The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development.

Lexi is seven years old and Rhett is four. The only expert to testify in the matter was Dr. James "Randy" Logan (Dr. Logan), Phd, MP, medical psychologist. Dr. Logan conducted an interview with Aimee and Lexi individually. Because of Rhett's young age and "his presentation consistent with [the] diagnostic hypothesis [that] he is positive for ADHD" Dr. Logan could not "collect reliable data via [an] interview" with Rhett. Dr. Logan's findings after his consultation with Lexie are helpful in making these difficult determinations. In his report he writes:

> Lexie (sic) was largely positive regarding all the parental figures in her life. She stated that she was hoping to move to Walker because she was looking forward to making new friends. She also identified some activities—a "humongous' water slide and some restaurants (Mexican)—she has discovered and enjoyed in the Walker area. She also revealed she has told her father "I don't know" when he asked where she would prefer to live because she doesn't want to "hurt his feelings."

Dr. Logan summarizes his findings as follows:

CONCLUSION: Aimee's reason for relocation appears to be both reasonable and consistent with the best interests of the children. It is acknowledged that I did not interview the father and as such there was no opportunity to assess his position in this matter. However, given that the relocating parent bears the burden of proving that the move is in the best interests of the children the findings of this consultation are believed to be both pertinent and of value to the Court in reaching its decision in this matter.

Dr. Logan's testimony was consistent with these findings. When asked if his opinion would change if it were proven in court that Aimee intentionally misled

him and/or the court concerning some of the background information she provided he explained that his assessment of Lexi would not be affected. He testified:

> My assessment of Lexie (sic), I think would largely stand. Independent of that, because I—I wasn't depending on Lexie to provide me that type of information. I was—when—when I spent time with Lexie I would like to show that she was not grilled. I do not grill children. I was very pleasant, and kind, and gentle as I would with my own children. And I just asked open-end questions about school and all the adults in their life and was very non-directive and to see if she would offer something. It might be pertinent to helping the court understand her preference and what might be behind it. She actually only had positive things to say about all the adults. She was positive about her time with her father and what she had done. So in view of that, her being positive, I asked her—I did ask her what—what would you thing (sic) about moving to Walker, because I was actually thinking she was going to yield information that would have been beneficial to his position. But surprisingly she said I want to move to Walker because I want new friends. I want to have the experience of getting new friends and new activities. And she was able to detail that.

When Dr. Logan was asked on cross-examination if he thought Aimee had tried to "motivate" her children to stay with her in Walker by taking them to fun activities "and different fun things so that they think of happy, happy, happy times with that parent?" he explained:

> Of course, the answer is yes. I don't—I don't think that's necessarily nefarious or manipulative. I think it's normal that when kids are with particular a parent (sic), they're going to go out of their way to make sure they're happy, and engaged, and entertained, and doing things they can profit from. So I think both sides probably have done that. So I would count that as a wash.

Additionally, when Dr. Logan was asked on re-direct examination "Is there anything in your written opinion, particularly your conclusion, that has been offered in lieu of my taking direct testimony from you that would change as a result of this cross examination or you sitting in court all day listening to the evidence?" he responded:

13

No, I—I think I after listening to the evidence it has strengthened my—my appreciation as a clinician that the mother is (sic) intent was reasonable and was here for the best interest of the children. I—I found her testimony very convincing in that regard. I'm not going to say the father didn't have the same best interest, but I can understand why the mother wants to move. And it's hard for me to imagine how it would subtract from the children's well being (sic) to—to—to move. It appears to me there would be many things they could benefit from.

Dr. Logan's interaction with Rhett led him to conclude that the child does appear to suffer with ADHD as alleged by Aimee. Aimee testified that she too, suffers from this condition and has taken medication and learned to live with this disorder. She asserts that she has a unique perspective from which to help Rhett and with her move to Walker and marriage to Aric she will have more time to devote to Rhett in helping him cope with and manage this condition. Max presented no evidence to the contrary. Considering the above we find this factor favors allowing relocation with the mother.

(3) The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.

Our review of the evidence and testimony shows the move to Walker would not adversely affect the existing relationship between these children and their father, stepmother, and the extended family of both. Aimee has already demonstrated a willingness to allow Max more time with the children in the summer in consideration of their moving a distance away from Deville, Louisiana. In terms of logistics and financial costs, Aimee has made a reasonable effort to accommodate the extra expense and travel time visited upon Max by the relocation of the children's domicile. Clearly the financial constraints on Max prohibiting him from relocating to the Walker area are equal to the constraints on Aric which compelled

14

him to buy a home in Walker. Aimee's impending marriage to Aric will certainly improve her situation financially and that of the children and allows her to amicably agree to lower Max's child support burden. We note that Max has already received a large benefit in this regard and, though he seems to place much emphasis on lowering the amount of support compared to the amounts calculated by using the state tables, the evidence of his substantial income belies the suggestion that the child support payments he was ordered to pay before and after they were lowered pose great financial difficulty for him. We find the evidence on this factor mitigates in favor of Aimee's proposed relocation.

(4)     The child's views about the proposed relocation, taking into consideration the age and maturity of the child.

As discussed above the record contains evidence only of Lexi's views concerning the proposed relocation. At four years of age and laboring under the affects of ADHD Rhett is unable to meaningfully contribute to this process. It is however, clear from Dr. Logan's testimony, and that of Aimee and Max as well, that Lexi has a positive outlook on the proposed move and fortunately for all concerned seems to be a very loving, bright, resilient and adaptable child. Thus, we find the evidence shows application of this factor to these facts favors allowing the proposed relocation with the mother.

(5)     Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.

Fortunately, in this case, both parents have promoted a loving and healthy relationship with the children and the other parent. Additionally, Aimee and Dusty Jo have demonstrated that as mother and stepmother they have worked amicably

15

and responsibly as adults to foster the children's relationship with Max's and Dusty Jo's parents. This factor is equally weighted between the parties.

> (6)    How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity.

Without repeating facts, we have discussed above, suffice it to say that the evidence shows at the very least that relocation to Walker will not adversely affect the quality of life for either child nor will it create any negative impact emotionally or educationally on either child. The evidence on balance shows Aimee's financial situation will improve and consequently serve as an advantage to the children. Her actions toward Max in agreeing to lower child support will directly benefit him financially with his new family unit. The schools in Walker are rated higher than those in Deville, though no evidence showed that the schools in Deville were in any way deficient. Thus, we find applying this factor to the facts of this case favors the mother's relocation with the children to Walker.

> (7)    The reasons of each person for seeking or opposing the relocation.

Both parties express strong reasons for seeking and opposing the proposed relocation. Aimee's stated reasons, the veracity of which is bolstered by Dr. Logan's expert opinion, concentrates more on the children's interests or benefits than her own. Aimee is looking forward to a new relationship and new life with Aric in part because such will benefit her children. Max is already enjoying a newfound happiness in his new relationship with Dusty Jo which he says includes his return to involvement in the church and a deeper spiritual life. His wife, Dusty Jo, does not oppose the relocation and demonstrates her total willingness to work with Aimee, the children and Max to make the situation as good as such

circumstances can be. We find this factor too, is equally weighted between the parties.

> (8)     The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.

As we have discussed above this relocation for Aimee represents an economic improvement in her circumstances which can only occur if she relocates to Walker to join her future husband. Max has shown he is unable to relocate without suffering an economic detriment. We find this factor also is equally weighted.

> (9)     The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations.

Max had a somewhat checkered record in providing financial support to his children, but he has shown some improvement in this area. However, we find this factor is adverse to Max.

> (10)    The feasibility of a relocation by the objecting person.

We find the record shows Max established it is not feasible for he and his family to relocate to the Walker area. In this case, we do not find this factor merits as much consideration as several others.

> (11)    Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.

There is no evidence in this case that this factor is applicable here.

> (12)    Any other factors affecting the best interest of the child.

We have thoroughly discussed above the evidence we believe pertinent to our decision in this case and it is not necessary to repeat it here. We do further

note, however, under the provision of La.R.S. 9:355.14 (B) the statute provides "[t]he court may not consider whether the person seeking relocation of the child may relocate without the child if relocation is denied or whether the person opposing relocation may also relocate if relocation is allowed." It is noteworthy that Aimee, contrary to the concern expressed in this provision, returned to Deville to resume domiciliary custody of the children as quickly as possible when given the choice to be with her children or move to Walker as proposed. While we are instructed that we cannot consider whether a person would relocate without their child, we certainly can, and do consider the fact, that when presented with the choice, Aimee did not hesitate to put her children first and promptly move back to Deville. This action speaks volumes and thus demonstrates further that Aimee puts the best interests of her children ahead of her own personal interests even when the price is quite high.

## DECREE

For the reasons stated we hereby reverse and vacate the trial court's ruling and render judgment herein in favor of Aimee Paul Moore granting her motion to relocate to Walker, Louisiana as the domiciliary custodial parent of the minor children Lexi Kay Moore and Rhett Lee Moore. Judgment rendered, Motion to Relocate Granted. All costs of this appeal are assessed against Maxwell Perry Moore.

**REVERSED, JUDGMENT VACATED. JUDGMENT RENDERED, MOTION TO RELOCATE GRANTED**.